HENRY G. RICE *et al.*, *v.* RALPH HENRY ISHAM.

Questions of fact upon a trial before a judge without a jury, and before a ref-
eree, are open to examination only upon an appeal to the General Term of
the court in which the trial took place.

If it cannot be made out from the findings whether the judgment is right or ·
wrong, it will be assumed to be correct and the judgment will be affirmed.

Such judgment, to be reversed, must appear to be erroneous by applying the
conclusions of law, or the general judgment pronounced, to the conclusions
of fact stated in the findings.

When, through the inadvertance of counsel, the facts are so presented that it is
impossible, without violating well-settled rules of practice, to do justice
between the parties, this court has power to suspend the judgment in order to
enable the party, whose rights might otherwise suffer, to apply to the court
from whose judgment the appeal was taken, for a re-settlement of the case.

· DENIO, Ch. J. This action was in the nature of assumpsit for
money paid to the defendant's use at his request, and was
brought in the Common Pleas of the city and county of New
York, to recover an alleged balance of $3,772.09, claimed to be
due to the plaintiffs, for advances as the factors of the defendant,
who was a manufacturer of felt goods at Glenville, in Con-
necticut, the plaintiffs carrying on their business at the city
of Baltimore.    The facts, as found by the referee before whom
the case was tried, were as follows: In February, 1852, an
arrangement was entered into between the parties by mutual
letters passing between them to the effect that the defendant
should make consignments of his goods to the plaintiffs for
sale on commission, and that the plaintiffs should accept the
defendant's bills at six months for two-thirds of the market
value of the goods.    During the course of the dealings which
ensued, the individuals of the firm of the factors was changed
by the retirement of one of the partners and the taking in of
a new partner, but after the close of the transactions the out-
going partner assigned his interest in the claim against the
defendant to the plaintiffs, and no point is now made
upon the question of parties.    Business of the character con-
templated was commenced and carried on down to and
including June 17, 1854, one Whittal acting as the agent of

the defendant, he having been named by the defendant to the plaintiffs as the person who, on behalf of the defendant, would forward the goods and draw the drafts. Eight several consignments of goods were made to the plaintiffs, the last of which was forwarded on the 21st January, 1854. The defendant drew a large number of bills on the plaintiffs, the last of which was dated June 17, 1864. These were drawn by Whittal as agent, to the order of, and were indorsed by the defendant, and they were payable six months after date. They were accepted and paid at maturity by the plaintiffs, the drawees. The goods consigned were, after considerable delay, finally sold; and, after crediting the proceeds, there remained a balance due from the defendant to the plaintiffs on the 20th February, 1856, of the amount above mentioned.

The defense set up arose in part out of an alleged change in the proprietorship of the manufacturing business, by means of which, as the defendant insisted, the liability for the advances, or a portion of them, had devolved upon an association or corporation which had succeeded to the business of manufacturing the felt goods, and which had taken the place of the defendant in the dealings with the plaintiffs. On that subject the referee found that the manufacturing business was carried on in the name of the defendant until the month of December, 1853, when, for reasons of convenience and advantage to himself, the name of "·The Glenville Woolen Company" was used by him, but without any change of interest; and that on the 25th May, 1854, a preliminary meeting for the organization of a company under the laws of Connecticut was held, and that on the next day a second meeting was held; but that the plaintiffs had no notice of such movements until on or about the 13th July, 1854; that said company was not completely organized, or authorized to commence business until the 13th day of December in that year; that the plaintiffs had never received any notice forbidding them to pay their acceptances, that they had not received any consideration for discharging the defendant from his liability, nor had ever agreed to discharge

him or to accept the corporation as their debtor instead of the defendant. The referee accordingly reported that in point of law the plaintiffs were entitled to recover the above mentioned balance with interest; and judgment was rendered accordingly, which was affirmed at a General Term.

Upon this statement of facts, it is difficult to see how any question of law can arise. *Prima facie,* it is an ordinary case between factor and principal, where the factor has advanced in excess of the proceeds of goods placed in his hands to be sold. It is very familiar law, that in such cases an action of assumpsit upon the implied contract, arises in favor of the factor, to recover the balance against the principal. Accordingly, the trial and the argument of the defendant's counsel bring forward a variety of facts found in the testimony, which, as it is alleged, show that the referee arrived at incorrect conclusions of fact upon the evidence. Twelve of the fourteen exceptions to the report, are based upon an alleged want of evidence, to sustain his conclusions. The thirteenth claims that certain facts should have been found, which are not found, and the last is a general exception to all their conclusions of law and fact. The statement of facts found contained in the case were made in pursuance of an express provision of the Code (§ 272); and it is furthermore explicitly provided, that although questions of law, arising upon trials, before a judge without a jury, and before a referee, may be reviewed upon every stage of the appeal, the questions of fact are open to examination only upon an appeal to the General Term of the court in which the trial took place. (§§ 268, 272.) Plain as this seems to be, upon the language of the statute, it has frequently been found necessary to re-assert it, and the decisions have been uniform and consistent. (*Davis* v. *Allen,* 3 Comst., 168; *Easterly* v. *Cole,* id., 502; *Borst* v. *Spelman,* 4 id., 284; *Western* v. *The Mut. Ins. Co.,* 2 Kern., 258; *Dunham* v. *Watkins,* id., 556; *Griscom* v. *The Mayor of New York,* id., 586; *Hunt* v. *Bloomer,* 3 id., 341; *Johnson* v. *Whitlock,* id., 344; *Magie* v. *Baker,* 4 id., 435; *Smith* v. *Grant,* 15 N. Y., 590; *Turner* v. *Haight,* 16 id., 465; *Otis* v. *Spencer,* id., 610; *Griffin* v. *Marquardt,* 17 id., 28; *Viele*

v. *The Troy and Boston R. R. Co.*, 20 id., 184; *Carman* v. *Pultz*, 21 id., 547; *Grant* v. *Morse*, 22 id., 323.) Some of these cases, and especially the one last noted, show that it is the duty of the party who designs to appeal to this court to procure such a finding of the facts, as to show affirmatively the error upon which he relies. If it cannot be made out from the findings, whether the judgment is right or wrong, it will be assumed to be correct, and will accordingly be affirmed; in other words, the judgment must appear to be erroneous by applying the conclusions of law, or the general judgment pronounced, to the conclusion of facts stated in the findings, or the appellant cannot ask for a reversal. But as has been said, the facts found in the present case fully sustain the judgment given, and it must therefore be affirmed.

It sometimes happens that by an inadvertance of counsel the facts are presented in such a manner that it is impossible, without violating well-settled rules of practice, to do justice between the parties. In such cases it is in our power to suspend the judgment here, in order to enable the party whose rights might otherwise suffer, to apply to the court from whose judgment the appeal was taken for a re-settlement of the case. It having been very earnestly insisted in this case that if the facts could be examined, without prejudice from the findings of the referee, it would appear that the judgment was manifestly wrong, I have looked into the testimony with a view to the exercise of the jurisdiction referred to if it should be invoked.

It is contended that the defendant ought not to be charged with two of the drafts which were drawn upon, and accepted and paid by the plaintiffs, because, as it is said, they were drawn after the defendant had disposed of his interest in the manufacturing business. They were dated respectively the 27th May, and 17th June, 1854, for $800 and $700, by Whittal as agent, and were in no manner distinguishable in ·form, or otherwise, from those which he had been accustomed to draw when the defendant was confessedly carrying on the business under the name of the Glenville Woollen Company. Conceding that the transfer of interest had taken place before

their date, the plaintiffs had no notice of any such fact or of any change in the proprietorship of the business until the 13th July, which was nearly a month after the drawing of the last. Whittal was the individual named by the defendant as the person who would draw the drafts on his behalf, and he had drawn all which preceded these two in question. Upon these facts there could be no question but that the acceptances were property chargeable to the defendant. If one employ an agent who deals with another on account of his principal, and he revoke the agency but do not give notice to the party with whom the agent had dealt, the principal is bound by the subsequent dealings had in good faith with the agent. (Paley on Agency, by Lloyd, 170, 188; Story on Agency, § 470; 2 Kent's Com., 615; *Vernon* v. *Manhattan Co.*, 22 Wend., 183.)

Another position of the defendant's counsel is that the plaintiffs' acceptances to a considerable amount, matured and were paid after the defendant had ceased to be interested in the business, and it had passed into the hands of a corporation. It is urged that there is no evidence that the acceptances had been negotiated to a *bona fide* holder. The course of business was for Mr. Whittal to send the drafts, which were payable at six months, to the plaintiffs for acceptance, who returned them accepted, either to Whittal or to some other agent of the drawer named by him. The evidence does not show who was the holder when this paper matured, though the circumstances render it extremely probable that the defendant or Whittal used them by procuring them to be discounted in the course of the business. Still the evidence is not positive to that point. When produced by the plaintiffs on the trial they all bore the blank indorsement of the defendant. To charge the plaintiffs with having paid them in their own money so as to deprive them of the right to charge the defendant with such payment, an unlawful diversion of them should have been proved, and that plaintiffs paid them with notice of such diversion. As the evidence stands, it presents only the case of the plaintiffs accepting negotiable bills at the defendant's request, under the arrangement to

accept by way of advance, placing such acceptances in his hands to do with them as he pleased, and paying the bills to the holder at maturity. There is, I think, no principle which can justly preclude the · plaintiffs from charging the defendant with the money thus paid.

The defendant's counsel contends, lastly, that the plaintiffs have released the defendant by means of their dealings with the company to whom he had transferred the manufacturing business. The defendant gave in evidence an instrument dated June 28, 1854, by which certain parties describing themselves as the president, treasurer and agent of the Glenville woolen company, in consideration of a transfer to that company made by the defendant, of the property employed in the manufacturing business there, engaged to assume the defendant's liabilities incurred in that business and to indemnify him against such liabilities. The plaintiffs received notice of the change of the business on the 13th July thereafter, and a few days later they were informed that the company had assumed the defendant's liabilities.

In the latter part of the summer of 1854 the goods which the plaintiffs had received from the defendant to sell had fallen in price, and it had become difficult to sell them, and they became anxious for a reduction of their advances, the balance of which amounted to over $8,000, which exceeded the proportions of the then market value of the goods for which they had agreed to accept in advance, and the drafts they had accepted were about maturing. They consequently contracted for such reduction. The correspondence was with Whittal, who had become the managing agent of the new proprietors, who, as has been mentioned, had assumed the liabilities of the defendant. The defendant insists, in the first place, that the plaintiffs had so contracted as to accept the new company as their debtors in the place of the defendant and to discharge the latter. But there is no evidence of an intention on their part to make such change. They had been told that this company had undertaken to discharge the liabilities of the defendant. It was indifferent to them what party paid them, so that they were paid by some one and

7

they naturally called upon Whittal and the other persons who represented this company, for payment, as that company had been named to them as the parties who were to liquidate these liabilities. This · was the more proper because the company had become the owners of the goods on their hands, and entitled to control them, subject to the factor's lien. There was nothing in the correspondence which ensued which operated as a release of the defendant, unless the making and transmission of the bills and notes to be now mentioned had the effect of extending the time of payment of the debt which the defendant owed them. By the letters which passed between Whittal and the plaintiffs from the 31st August to the 13th November, 1854, inclusive, an understanding seems to have been arrived at that the plaintiffs' account should be reduced by the payment of $3,000 in cash, and that they should receive the debts of the company on themselves for about $6,200, payable on time, which they should procure to be discounted at the then prevailing rate of interest in order to place themselves in funds, and in the mean time sales of the remaining goods were to be made as fast as practicable. Accordingly, on the 13th November, Whittal sent to the plaintiffs three drafts of the company, amounting together to $6,200, bearing different dates in October and November, each payable six months from date, "to be discounted," as his letter expressed it, "and the proceeds used in liquidation of advances made against goods held by you on our account." The plaintiffs immediately acknowledged the receipt of the drafts, saying that it "would all be very well if they had been accompanied with a check for $3,000," which they hoped he would still remit. They did not procure the drafts to be discounted or use them in any way, and the $3,000 was never remitted, Whittal, writing them on the 18th November, saying that he could not possibly send the cash at present on account of the extreme pressure of the money market. These drafts did not operate to extend the time of payment of the balance due from the defendant; for first, they were only to be received in connection with the cash · payment which was to

have been made at the same time, and which was never made, and secondly, they never became operative instruments in the hands of the plaintiffs. ' They were the drawees, and could never have maintained an action on them against the drawers and indorsers. It is unnecessary to say what would have been their effect if the plaintiffs had procured them to be discounted by third parties; but this they did not do, apparently because Mr. Whittal had not fulfilled his part of the arrangement under which they were sent.

But sometime in April, 1855, Whittal sent to the plaintiffs two promissory notes of this company, dated respectively on the 1st and 27th of that month, for $1,000 each, and payable six months after date. The purpose of transmitting this paper is not fully explained, but it seems probable from the correspondence that it had some reference to the cash payment agreed to be made the preceding year. The receipt 'of these notes is relied upon as extending the payment of so much of the debt due from the defendant, the argument being that, under the circumstances, the defendant is to be considered as standing in the relation of a surety for the company, it being the principal debtor. I hardly believe these notes were sent on the 22d of March, 1855, the plaintiffs being apparently under some apprehension that the ground now relied upon might be taken, addressed themselves directly by letter to the defendant. They mentioned to him that the balance in their hands was about $8,000, and gave him a statement of the quantity of goods remaining unsold. They then referred to an interview, between Mr. Chase, one of the plaintiffs' firm, the defendant himself, and Whittal, a few weeks before, in which it was, as they say, agreed that their advances should be reduced by the Glenville company, giving their notes for that purpose, with a letter from the defendant approving of the same, and that they, the plaintiffs, had learned by a letter from Whittal that he desired a little more time to perfect that arrangement, and that they would be satisfied with an answer from him that it should be arranged in the first two 'weeks of the next month. The defendant answered that letter from New York the next day.

He makes no denial of the interview referred to by the plaintiffs, or of the arrangement said to have then been made, but says he will lay their letter before Whittal on his return from a journey upon which he was then absent; that he knows no reason why an arrangement he had agreed upon should not be carried out by him within the time suggested. This letter is somewhat cautious, and a little evasive; and looking at it in the light of subsequent events, there is some ground to suspect an intention to lead the plaintiffs on to a committal which would discharge the defendant from his liability. It imports, however, *primâ facie*, the consent of the defendant, that the plaintiffs might receive the notes of the company without prejudice to his liabilities, and such is the sense in which the plaintiffs had, in my opinion, a right to receive it, and in which they certainly did regard it. That they did so regard it is entirely evident from their receiving the notes of the company shortly afterward. The notes were not paid, but were protested at maturity, and the company failed in December following. The defendant cannot, in my judgment, object that the plaintiffs had given time to the company to his prejudice, as the evidence shows that the notes were taken with his consent, and in pursuance of an arrangement to which he was a party. There are some minor circumstances relied upon by the defendant's counsel, but which do not materially change the aspect of the case. The drafts forwarded in November were at one time credited in an account current, but were taken out upon the re-statement of the account upon which the request was based, as they were never operative against the company, or any one, the auditing them was simply an error in book-keeping, which did not prejudice the defendant. Upon a review of the whole case my conclusion is that the defendant had no defense to the claim upon which the judgment was recovered, and that we should not be able to reverse it if the review had been upon the facts.

Affirmed.